## Adams Express Company v. Commonwealth.

(Decided October 6, 1914.)

### Appeal from Laurel Circuit Court.

1. Intoxicating Liquors—Interstate Shipment of—Webb-Kenyon Act —Validity.—Congress, under its power to regulate commerce among the several States, may prohibit the shipment of intoxicants from one State into another, and establish such standards as it sees fit. The Webb-Kenyon act is valid, although the standard established is to be determined by the law of the State into which the shipment is made.

2. Intoxicating Liquors—Incumbent Upon Carrier to Exercise Ordinary Care to Ascertain Purpose of Shipment.—It is incumbent on the carrier to exercise ordinary care to ascertain the purpose for which a shipment of whiskey is made. If it exercises such care and acts upon reasonable grounds, it is not liable where it is in fact misled, otherwise it is liable.

3. Intoxicating Liquors—Prosecution Against Carrier—What Agreement of Record too Broad to Warrant Peremptory to Find Guilty. —An agreement of record that the' carrier made the shipment in the usual course of business in good faith, believing that the whiskey was intended for personal use only, is too broad to warrant a peremptory instruction to the jury to find the defendant guilty

LAWRENCE MAXWELL, JOSEPH S. GRAYDON and GEO. W. BROCK for appellants.

JAMES GARNETT, Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON— Reversing.

The Adams Express Company, a common carrier, was indicted in the Laurel Circuit Court for bringing into and delivering whiskey in that county, where the local option law is in force. On the trial of the case the following agreed statement of facts was read to the jury:

1. The Adams Express Company is an association organized under the laws of the State of New York, doing business as a common carrier, and having an agency at Jellico, Tennessee, and at London, Kentucky.

2. On November 14, 1913, and within twelve months before the filing of the indictment, James Cheek, who resided in Laurel County, about twelve miles from London, ordered from a wholesale liquor dealer in Jellico, Tennessee, four gallons of whiskey to be shipped to him by the Adams Express Company, he remitting in the letter the money to pay for the whiskey. The dealer received the letter and delivered the whiskey to the Express Company at Jellico, Tennessee, consigned to James Cheek, at London, Kentucky. The express company transported the package to London, and there delivered it to James Cheek, "as a public common carrier for hire, and in its usual course of business and within twelve months before the filing of the indictment in this case."

3. At that time all sales of liquor in Laurel County were prohibited by law.

4. "When the consignment was received at London, the said company's agent at London, did not know said Cheek, but believed in good faith that the liquor had been ordered for his own personal use, and, under that belief, it delivered the consignment to said Cheek."

5. After receiving the whiskey, Cheek, in Laurel County, sold by retail to different persons a greater part of the whiskey before the indictment was made; he purchased the whiskey chiefly for the purpose of selling it in Laurel County.

6. At the time the whiskey was delivered to Cheek, neither the company nor any agent of it, knew that he intended the liquor for any purpose other than his own personal use.

7. At the time of ordering and receiving the whiskey, Cheek intended to sell it in Laurel County; "but the defendant, nor any agent, steward nor employe of it, did not have knowledge or belief that such was his intention."

8. The defendant knew at the time it was contrary to law to sell whiskey by retail in Laurel County.

9. When the defendant delivered the whiskey to Cheek the act of Congress known as the Webb-Kenyon Act was in full force.

10. Cheek was not a physician or licensed druggist.

This was all the evidence. The defendant moved the court to instruct the jury on these facts to find it not guilty. The court overruled the motion, and on motion of the Commonwealth instructed the jury that on these facts, they should find the defendant guilty. The jury returned a verdict finding it guilty and fixing its punishment at a fine of $75.00. The court refusing to grant a new trial, entered judgment on the verdict; the defendant appeals.

Section 2569a, Kentucky Statutes, omitting some provisions not material here, is as follows:

"It shall be unlawful for any * * * public or private carrier to bring into, * * * deliver or distribute, in any county, district, precinct, town or city, where the sale of intoxicating liquors has been prohibited, * * * any spirituous, vinous, malt or other intoxicating liquor, regardless of the name by which it may be called; and this act shall apply to all packages of such intoxicating liquors whether broken or unbroken. * * * Any * * * public or private carrier violating the provisions of this act shall be deemed guilty of violating the local option law and shall be fined not less than fifty nor more than one hundred dollars for each offense. * * * And the place of delivery of such liquors shall be held to be the place of sale; * * *."

That this statute is constitutional and operative as to intrastate shipments of intoxicants, is well settled. But, prior to the passage of the Webb-Kenyon Act, it had no operation as to interstate shipments, such as that complained of in this case. (Adams Express Company v. Commonwealth, 129 Ky., 420; L. & N. R. R. Co. v. Cook Brewing Co., 223 U. S., 70.) The provisions of the Webb-Kenyon Act enacted February 28, 1913, are as follows, omitting some verbiage not material here:

"That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous. malted, fermented, or other intoxicating liquor of any kind, from one State * * * into any other State, * * * which said spirituous, vinous, malted, fermented or other intoxicating liquor is intended, by any person

interested therein, to be received, possessed, sold or in any manner used, either in the original package or otherwise, in violation of any law of such State, * * * is hereby prohibited.''

It will be observed that this act does not prohibit the shipment or transportation of intoxicants under all circumstances from one State into another; but only prohibits the shipments of such liquors as are ''intended by any person interested therein to be received, possessed, sold or in any manner used, either in the original package or otherwise, in violation of any law of such State.'' Unless the liquor is intended by some person interested therein to be received, possessed, sold or used in violation of the law of the State, the act does not apply to it. We accordingly held in Adams Express Company v. Commonwealth, 154 Ky., 462, that the act does not apply to shipments of whiskey from another State into this State, where the consignee gets it simply for his personal use, there being no law of this State making it unlawful for a person to receive or possess intoxicants in this State for his own personal use. That decision followed the plain language of the act, as well as the express construction put upon it by Mr. Webb and Senator Kenyon in their speeches in advocacy of it on the floor of Congress; and the same view has been taken so far as we are advised by all the courts of last resort, before whom the question has been presented. (Atkinson v. Southern Express Co., 78 S. E., 516, 520; Palmer v. Southern Express Co., 165 S. W., 236; VanWinkle v. State of Delaware, 91 Atlantic, 385.) But this case differs from that. Here it is agreed that Cheek ordered and received the whiskey for the purpose of selling it in Laurel County in violation of law, thus bringing the case literally within the provisions of the Webb-Kenyon Act. So the first question in the case is: Is that act valid?

It is insisted for the appellant that the transaction in controversy being fundamentally interstate, Congress alone can exercise control over it, and no control over it can be exercised by the State. By subsection 3 of section 8 of article 1 of the Constitution of the United States, Congress has power to regulate commerce among the several States. The power to regulate carries with it the power to determine what shall be legitimate commerce, and to prohibit commerce which is

deemed to be illegitimate. The words "commerce, among the several States" mean legitimate commerce, and when Congress has determined that certain commerce is not legitimate, it has exercised its power, and such commerce is no longer protected by the federal constitution. When acts which are forbidden by Congress are done within a State and in violation of its laws, the State may punish the infraction of its laws for the reason that Congress has placed these acts beyond the pale of interstate commerce. The Constitution of the United States was framed by a convention composed of the citizens of the several States, and before it became effective it was adopted by the States. It must receive a reasonable interpretation within the just contemplation of those who made and adopted it. The reason for giving Congress the power to regulate commerce among the several States was to protect legitimate interstate commerce from regulations made in each State in the interest of that State, rather than in the interest of the people of the United States as a whole. But it was not contemplated that the power of Congress over the subject should be limited or that Congress could not outlaw certain branches of commerce by prohibiting them altogether, and thus leave the States at liberty to protect themselves under the police power from these outlaws. It is conceded that in respect of such articles as diseased cattle, infected rags, lottery tickets and the like, this may be done. (Lottery cases, 188 U. S., 321, Minn. Rate Cases, 230 U. S., 406.) It is insisted, however, that Congress may not prohibit interstate shipments of intoxicants intended to be disposed of contrary to the law of the State, thus making the prohibition to depend upon the law of the State. But the power to regulate the subject carries with it the power to define what shall be commerce among the several States. The standard by which this shall be determined is left to the discretion of Congress. When any act is prohibited by Congress that act becomes unlawful, and the person doing the act is no longer under the protection of the constitutional provision protecting interstate commerce; for the act is not interstate commerce as defined by Congress. Any other construction of the constitutional provision would do violence to the intention of the framers of that instrument; for they contemplated conferring upon Congress the plenary power to regulate the subject, and in regulating this subject Congress was at liberty to adopt

such standards as it saw fit.  Who can believe that the framers of the Constitution intended to take away from the sovereign States in these matters police power and also to take away from Congress the power to define when the police power of the State might be exercised? Control of the sale of narcotics and intoxicants has always been regarded within the police power of the State.  The evils of intemperance, the pauperism, insanity, the wrecking of homes and the destruction of useful lives resulting from the sale of intoxicants, are just as real and often much more felt than the evils from the selling of lottery tickets, diseased cattle or infected rags.  Congress may in its discretion take such action as it deems best, and when Congress has outlawed the traffic or any part of it, the acts so outlawed, if done within the State, and in violation of its laws, may be punished by it under the police power.  Upholding the act in State v. U. S. Express Co., 145 N. W., 458, the Supreme Court of Iowa said:

"There can be no doubt that the Congress, in virtue of its power over interstate commerce, might, in its discretion, put its ban upon all transportation of liquors in interstate shipment, just as it has done with lottery tickets, the shipment of liquors to Indians, the method of shipment of liquor by express companies, the shipment of game, the carriage of infected live stock, the white slave traffic, etc.  All of these and other like acts were passed to aid States which came within these provisions in the enforcement of local laws which they deemed of vital importance to their citizens; in other words, to aid them in the enforcement of their police regulations.  The act simply removes the bar theretofore existing to the enforcement of police regulations, because of the interstate character of the transaction, and, if it be within the power of the Congress to forbid the shipment of all liquors in interstate traffic, no logical reason is perceived why it may not do less, and forbid the shipment under certain conditions."

To some effect see State v. Doe, 139 Pac., 1169; American Express Company v. Beer, 65 Sou., 575; Southern Express Co. v. State, 66 Sou., 115; State v. Grier, 88 Atl., 579.

We, therefore, conclude that the act is valid.

The next question is: Do the agreed facts show the defendant to be guilty, and warrant the peremptory in-

struction which the court gave the jury? Under the act of Congress the shipment of the whiskey was not forbidden unless it was intended by any person interested therein to be received, possessed, sold or in any manner used in violation of the law of the State. It will be observed that in the agreed facts it was stipulated that the express company transported the whiskey to London, and there delivered it to James Cheek in its usual course of business; that it did not know Cheek, but believed in good faith that the liquor had been ordered for his own personal use, and under that belief, it delivered the whisky to him not knowing that he intended the liquor for any purpose other than his own personal use, and that it did not have knowledge or belief that it was his intention to sell it in Laurel County. In L. & N. R. R. Co. v. Commonwealth, 126 Ky., 286, we quoted with approval from Bishop on Statutory Crimes, section 132, as follows:

"One who, while careful and circumspect, is led into mistake of facts, and, doing what would be in no way reprehensible were they what he supposes them to be, commits what under the real facts is a violation of a criminal statute, is guilty of no crime, because such is the rule of the common law, and in construction it restricts the statute.

"Where the statute is silent as to the defendant's intent or knowledge, the indictment need not allege or the government's evidence show that he knew the fact. His being misled concerning it is matter for him to set up in defense and prove."

We then said:

"The defendant must not shut its eyes, but must use ordinary circumspection, and, if the facts before it are sufficient to apprise a person of ordinary prudence of the truth, it can not escape liability. On the question of the good faith of the express company the Commonwealth should not be confined in the proof to the one transaction named in the indictment, but should be allowed to show the manner in which the business of the office was conducted, and such other facts as are competent under the rules of evidence where the question of intent or good faith is involved."

This case was followed and approved in Adams Express Co. v. Commonwealth, 129 Ky., 420, where we had under consideration section 2569a, Kentucky Statutes, and a box of bottles of whiskey was shipped as paint.

After setting out the facts and referring to our ruling in the former case, we said:

"So the question for the jury was: Did the agents or either of them know, or have reason to know, of the real contents of the package, and were they, in spite of such notice as they may have had, actually deceived, although acting in good faith and with proper caution in the matter? Common carriers ought to obey the law just like other people, not in merely keeping its letter while breaking its spirit, but keeping both letter and spirit under such circumstances as other people are expected to do. An agent of a common carrier is required to exercise the same kind of judgment, and to have as much sense in doing his employer's business as if he were doing the business for himself; and what would convince him, or ought to, that a certain fact exists, is notice to his master of its existence."

We did not intend to lay down a different rule in Adams Express Co. v. Commonwealth, 154 Ky., 462. No such question was presented in that case and the court did not attempt to define when the carrier would be liable.

It is true a different rule has been laid down in some cases where the statute requires an act to be done or omitted, and provides a penalty (L. & N. R. R. Co. v. Commonwealth, 130 Ky., 738; Ulrich v. Commonwealth, 69 Ky., 400, and like cases) but in those cases it did not appear that the defendant though circumspect, made a mistake of fact as to what he did, the truth being otherwise than he supposed.

As we understand the agreed facts, it is agreed that the defendant carried and delivered the whiskey in the usual course of business without knowing or believing that Cheek intended to sell it, and believing in good faith it was for his personal use. This agreement as to the defendant's good faith is too broad to warrant the peremptory instruction to the jury to find the defendant guilty, although the jury without this might have inferred a want of good faith from the facts stated under a proper instruction. When whiskey is shipped into local option territory and delivered by a carrier, it is incumbent on the carrier before delivering the whiskey, to be circumspect and use ordinary care to learn for what purpose it is to be used. If it acts upon reasonable grounds in good faith, after such investigation as ordi-

nary care requires, and is misled, it is not liable; otherwise it is; this is a question for the jury on the facts and the court should instruct the jury as above indicated.

This transaction having occurred before the act of 1914 was passed, is governed by the law then in force.

Judgment reversed and cause remanded for a new trial.