STATE, RESPONDENT, v. KEPLER ET AL., APPELLANTS.

(No. 5,984.)

(Submitted October 18, 1926. Decided October 30, 1926.)

[250 Pac. 603.]

*Intoxicating Liquor—Unlawful Possession and Sale—Evidence—Maintaining Common Nuisance — Insufficient Evidence—Record on Appeal—Court Minutes—Presumption.*

Intoxicating Liquor—Unlawful Sale—Evidence—Sufficiency.
1. Evidence reviewed and held sufficient to support a verdict of conviction for selling intoxicating liquor.

Same—Possession—What Constitutes.
2. The proprietor of a tailor-shop who knowingly permitted moonshine whisky to remain therein, taking an active part in dispensing a portion of it, was in possession of the liquor within the meaning of the prohibitory Act.

Same—Moonshine Whisky—Possession Prima Facie Evidence of What.
3. Possession of moonshine whisky is necessarily unlawful and such possession is *prima facie* evidence that the whisky was kept for unlawful purposes.

Same—Maintaining Common Nuisance—Sale on One Occasion Insufficient Evidence.
4. Evidence *held* insufficient to sustain a finding that defendant was guilty of maintaining a common nuisance by permitting liquor to be dispensed at his place of business, where it was not shown that he habitually used the place for a violation of the liquor law, the record disclosing the sale of moonshine whisky on a single occasion only.

District Courts—Correction of Minutes—Presumption.
5. Where the trial court ordered a minute entry expunged it will be presumed that its action was proper, in the absence of a sufficient showing that it committed error in doing so.

Trial—Continuance—Refusal—Absence of Bill of Exceptions—Alleged Error not Reviewable.
6. Alleged error in denying a defendant charged with crime a continuance where the motion was based upon an affidavit, is not reviewable on appeal in the absence of a bill of exceptions in the record including the affidavit.

---

[1]   Intoxicating Liquors, 33 C. J., sec. 510, p. 764, n. 1.
[2]   Intoxicating Liquors, 33 C. J., sec. 198, p. 585, n. 9 New; sec. 505, p. 761, n. 53.
[3]   Intoxicating Liquors, 33 C. J., sec. 479, p. 743, n. 97.
[4]   Intoxicating Liquors, 33 C. J., sec. 522, p. 770, n. 17, 19, 21, 22.
[5]   Criminal Law, 16 C. J., sec. 1017, p. 539, n. 47; 17 C. J., sec. 3601, p. 274, n. 17.
[6]   Criminal Law, 17 C. J., sec. 3470, p. 179, n. 3; sec. 3558, p. 212, n. 16.

3. Possession of intoxicating liquor as evidence of violation of law, see note in 31 A. L. R. 1222. See, also, 15 R. C. L. 399.
4.   See 15 R. C. L. 405.
6.   See 2 R. C. L. 127.

*Appeal from District Court, Cascade County; Stephen J. Cowley, Judge.*

OKEY KEPLER was convicted of selling intoxicating liquor, and John Millsap was convicted of possessing intoxicating liquor and maintaining a common nuisance, and appeal. Affirmed as to defendant Kepler, and remanded, with directions, as to defendant Millsap.

Cause submitted on briefs of counsel.

*Mr. D. J. Ryan,* for Appellants.

*Mr. L. A. Foot,* Attorney General, and *Mr. I. W. Choate,* Assistant Attorney General, for the State.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

Okey Kepler and John, or W. H., Millsap, were charged with selling intoxicating liquor, possessing intoxicating liquor, and maintaining a common nuisance. Each came into court with his counsel and pleaded not guilty, Millsap on April 30 and Kepler on May 1, 1926.

On May 28 there was entered in the minutes of the court an entry stating that the defendant Okey Kepler, by his counsel, D. J. Ryan, in open court asked leave, which leave was granted, to withdraw Kepler's former plea of not guilty and to enter a plea of guilty of possession of intoxicating liquor, whereupon Kepler was ordered to appear at 2 o'clock P. M. on that day to receive sentence. Upon the same day an entry was made in the minutes showing that Mr. Ryan, as attorney for Okey Kepler, withdrew the former plea of not guilty and forthwith entered a plea of guilty as charged in the information and "the said case was dismissed as to John Millsap." On June 3 the court denominated the foregoing erroneous entries and ordered them expunged from the record. After this

order was entered the court proceeded with the trial of the case and without objection from anyone, so far as the record discloses; but Mr. Ryan announced: "The record will show I am not appearing for Okey Kepler."

Nevertheless it appears to us from the record that Mr. Ryan did represent Kepler, and with as much zeal as he represented Millsap, throughout the trial. Upon the conclusion of the testimony the court instructed the jury which returned a verdict finding the defendant Kepler guilty of selling intoxicating liquor and the defendant Millsap guilty of possessing intoxicating liquor and of maintaining a common nuisance. The defendants severally have appealed from the judgments entered upon the verdicts.

The specifications of error are, in effect, that the evidence is insufficient to sustain the verdicts; that the court erred in amending its minutes; that the court erred in not granting a continuance of the cause upon the application of Kepler, and in not giving the appellants and each of them time in which to procure their witnesses and prepare for trial.

1. The evidence discloses that upon December 26, 1925, Eu[1] gene Van Wert and C. S. Hanna, state law enforcement officers, went to defendant Millsap's "clothes pressing establishment and barber shop" on First Avenue South in the city of Great Falls. The arrangement of the place was thus described by Millsap: "The place I am occupying is a long building; the store is about 60 foot, I guess long, and I would judge it is about, oh, 30 feet wide, and in that store I put in a partition in the back, about 18 or 20 feet, cut it open one side; on one side I put in a barber shop, and on the other side I put the tailor shop. There is a place that you can walk right down through to a back room. * * * There is no door between the two rooms, just an opening in there. I never attempted at any time to conceal the second room from the front room; you could see right straight through."

Arriving at this place Van Wert went in first, preceding Hanna by a few feet. Millsap was sitting near the opening

described above. As Van Wert reached that point Millsap started to get out of his chair and called to Kepler who was in the rear room, but Van Wert, who knew Millsap well, pushed him back in the chair and said, "Sit down, Millsap." Kepler was filling a pop bottle with moonshine whisky from another bottle; this completed, he put a cork in the pop bottle and handed it to a man who was waiting for it. As the man turned to go out, this occurred, according to Van Wert: "I said to Mr. Kepler—I saw he had some glasses there where he had been making hot drinks—I said, 'Make us a hot one,' and he started to do it. Mr. Millsap told him to stop. Millsap said, 'This is Mr. Van Wert, don't serve him liquor'; and Kepler laughed and said, 'No,' he said, 'that is not Van Wert'; he said, 'I know Van Wert, that is not Van Wert.' We all laughed considerably, and I told Mr. Kepler to go ahead, and he went ahead and made us a drink of moonshine whisky with a little hot water." Van Wert paid Kepler for the drinks received by himself and Hanna, whereupon Millsap said to Kepler, "Now you have gone and done it; you have taken his money." Kepler still insisted that Van Wert was not there, and Millsap said, "You told me that you knew Van Wert, that you shaved him the other day," to which Kepler replied, "Yes, I do know him; I did shave him."

The first bottle was soon exhausted and Kepler said he would have to go out and get a bottle. He started and Millsap followed and talked with him. Kepler protested that Van Wert was all right. Kepler went out and returned with another bottle, from which he poured a drink for Hanna, whereupon he was arrested and the bottle seized. Millsap was arrested also.

Hanna gave similar testimony. After Kepler gave the man the pop bottle full of whisky he served Van Wert and Hanna with drinks near the refrigerator, and—"Millsap at the time stated he would not serve those men—that is, Mr. Van Wert there—and there was considerable talk about that, and Kepler insisted that he was not Van Wert. He said, 'I know Van Wert,' he said, 'I know this fellow; he would not bring any

one in here that was not all right.' He said, 'I knew him at Butte.' "

Millsap is a colored man and there were two other colored men and a white man in the place besides Kepler when the officers entered. When, as Hanna testified, it came his turn to buy a drink the bottle was almost empty. "Kepler went out and got another bottle and came back and served us a drink of moonshine whisky. This time I paid for them and gave Kepler a $10 bill, and Kepler handed it to one of the men there, who had to go out and get it changed, and this other man came in with the change. We had a conversation there for some little while, and Millsap recognized me later. At first he did not recognize me. Finally he said, 'Why, this is Mr. Hanna too, isn't it?' He laughed about that. He told Kepler that I was one of the prohibition officers of the state, and then finally I got up and went to the refrigerator and told Kepler he was under arrest, and took the pint bottle out of the refrigerator."

Kepler, testifying for the defendant, in response to questions propounded by Mr. Ryan, narrated that when Van Wert and Hanna came in there were four or five men in Millsap's place and that they had a bottle; one of the boys went out and got a bottle. They were sitting there drinking when Van Wert came in. After Van Wert had called for the hot one, said Kepler, "Well, Mr. Millsap said, 'If you gentlemen really have to have a hot one, I'll go and get the water, provided this boy will go and get you the whisky.' So I went out and got the liquor and came back, and Mr. Millsap had the hot water and glasses; so we made the hot one, and we all drank that pint of liquor up." He denied that he charged either Van Wert or Hanna for any drinks they got there that night and said that no money changed hands at all, "no more than what somebody chipped in to get a bottle that way." He said he never knew of any whisky being sold in Millsap's place.

Millsap, testifying for the defendants, gave an interesting account of the affair. According to him, Van Wert came in,

spoke pleasantly, and then said, "Kepler, how about a hot one?" Kepler inquired, "Are you cold?" to which Van Wert replied, "I want a hot one; it is cold." Kepler said, "Sure, I will get you a hot one; are you cold?" and Van Wert answered, "Yes; I am cold," "So he looked around at me then, and he kept his eye on me, Mr. Van Wert did. I smiled and he smiled, too. Kepler said, 'I will get you one.' I saw he was going to try to get him into trouble. I said, 'Kepler, if you don't know that man, it is Van Wert, the head man of the state. That is Mr. Hanna, his assistant.' I said it out loud. I said. 'If you give either one of them a drink you go to jail.' I saw he was intending to give it to him; so I finally said, 'I know Van Wert; I have known him for a long time; there isn't any mistake about that; I know Mr. Hanna.'" Turning to the officers: "You know that this is my place. If you are going to come in here and take a drink, you will have to assure me that you will not take anybody to jail before I leave anybody give you anything. He said, 'You can trust me; I am cold.' I really thought he was honest about it because I knew him."

At the time of the arrest Kepler seemed to be dazed, he "didn't seem to be able to savvy. Van Wert said, 'I want you to tell this boy just exactly what he has done.' 'Well,' I said, 'Mr. Van Wert, there is nothing for me to tell. I have already explained everything to him. I told him from the beginning that you were the head man of the state, and I called your name when you come in. I can't tell him anything.' He said, 'Go ahead and tell him again.' I said, 'You are going to take him to jail and me too.' I said, 'It is pretty bad to take advantage like that, Mr. Van Wert. I guess you can do it if you want to.'"

This appears to be a clear case of misplaced confidence on part of both of the defendants.

The assignment that the evidence against Kepler is insufficient to support the verdict cannot be sustained. Nor, con-

sidering all the evidence, can we say it is insufficient to sustain the verdict finding Millsap guilty of the possession of intoxi-
[2]   cating liquor. The premises were in the actual control of Millsap. According to his own testimony moonshine whisky was there given away; the jury found it was sold. When the officers came into the building they observed Kepler filling a bottle with moonshine which was delivered to a man who took it away, and the evidence justifies the conclusion that Millsap was aiding and abetting Kepler, although the jury did not find him guilty of selling liquor. It is clear that Millsap attempted to warn Kepler of impending danger when that transaction was taking place. Millsap took an active part in furnishing the ''hot one'' to Van Wert and Hanna. So as a matter of law he was in possession of the liquor. He permitted it to remain within a room when it was his legal duty to see that it did not remain there. His refrigerator was made use of as a receptacle for it. The circumstances were such that he knew or should have known that.

As was said by the supreme court of Oregon, in *State* v. *Harris,* 106 Or. 211, 211 Pac. 944, he had the power to control the presence or absence of the whisky in the room. ''Having the power to prevent the whisky from remaining in the room, and being in the actual possession of the room, the defendant was *prima facie* in the possession of the whisky, and if he knew that the whisky was in the room, he was in possession of the whisky within the meaning of . the statute.'' (Thorpe on Prohibition and Industrial Liquor, secs. 388, 399; and see *Smith* v. *Commonwealth,* 136 Va. 677, 116 S. E. 246; *Spradlin* v. *City of Roanoke,* 134 Va. 600, 113 S. E. 732.)

As the whisky was moonshine, the possession thereof neces-
[3]   sarily was unlawful. Such possession was *prima facie* evidence that the whisky was kept for the purpose of being sold, bartered, exchanged, given away, furnished, or otherwise disposed of in violation of the law. (Chap. 116, sec. 3, Laws 1923; *State* v. *Sawyer,* 71 Mont. 269, 229 Pac. 734.)

But the evidence does not sustain the conviction of Millsap
[4] for maintaining a common nuisance. The evidence in-
dicates that the defendant does in good faith maintain a
tailoring business and barber shop in connection, and there is
no testimony indicating that it was habitually used for any
other purpose. He permitted the law to be violated on De-
cember 26, 1925, but so far as we are advised he never before
had permitted its violation there. As we said in *State* v.
*Jenkins,* 66 Mont. 359, 213 Pac. 590: ''We cannot agree that
evidence of one sale, without repetition, with no other evidence
of law violation or facts strongly indicating either habitual
sales, continued violation, or such recurrence of unlawful acts
as to colorably indicate the unlawful character of the use of
the house, would constitute a nuisance. It is not the crime
of selling a single drink of liquor which constitutes the nui-
sance, but it is the maintenance and use of the room or house
for so doing the unlawful acts which constitute the nuisance.''
While the evidence indicates more than one drink of liquor was
sold, upon the whole case the circumstances surrounding the
transactions do not justify a verdict finding Millsap guilty
of maintaining a nuisance in his place of business.

2. Appellants have not sustained the burden of showing the
[5] court erred in amending its minutes. The presumption
is that the minutes were corrected to speak the truth in ac-.
cordance with the duty which the law imposes upon the court.
(*State* v. *Turlok,* 76 Mont. 549, 248 Pac. 169.)

3. The record does not permit us to inquire whether the
[6] court erred in not granting the continuance. The mat-
ter was sought to be presented to the trial court by an affidavit
filed on the morning of June 3. This affidavit is not included
in the bill of exceptions and cannot be considered. Section
12045, of the Revised Codes of 1921, provides in part that:
''The record on appeal in a criminal case shall consist of the
judgment-roll as defined in section 12074 of this Code, a copy
of the notice of appeal and all bills of exceptions settled and
filed in the case.'' Section 12074 prescribes that the following

papers constitute the judgment-roll: (1) The indictment or information and a copy of the minutes of the plea or demurrer; (2) a copy of the minutes of the trial; (3) the charges given or refused and the indorsements thereon; (4) a copy of the judgment.

While Mr. Ryan has not signed the brief as attorney for the defendant Kepler, we have chosen to consider that he has represented both defendants upon the appeals. Otherwise we would be compelled to affirm the judgment against Kepler without giving it consideration upon the merits pursuant to the provisions of section 12122, which declares: "The judgment may be affirmed if the appellant fail to appear, but can be reversed only after argument, though the respondent fail to appear." (*State* v. *Guerin,* 51 Mont. 250, 152 Pac. 747.) In the brief counsel has argued Kepler's case as well as that of Millsap.

The judgment against the defendant Kepler is affirmed. As to the defendant Millsap the cause is remanded to the district court of Cascade county with directions to set aside the judgment rendered upon the third count of the information and to pass sentence upon, and enter judgment against, the defendant Millsap, for the crime of possessing intoxicating liquor. When so modified the judgment shall stand affirmed.

ASSOCIATE JUSTICES STARK and MATTHEWS concur.

JUSTICES HOLLOWAY and GALEN not sitting.